## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **MELINDA L. TERRY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **CIVIL ACTION** |
| **v.** ) | |
| ) | **No. 14-2110-JWL** |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

## MEMORANDUM AND ORDER

Plaintiff seeks review of a decision of the Commissioner of Social Security

(hereinafter Commissioner) denying Supplemental Security Income (SSI) benefits under

sections 1602 and 1614(a)(3)(A) of the Social Security Act.  42 U.S.C. §§ 1381a and

1382c(a)(3)(A) (hereinafter the Act).  Finding no error, the court ORDERS that judgment

shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the

Commissioner's decision.

## I.      Background

Plaintiff applied for SSI, alleging disability beginning June 25, 2012.  (R. 10, 174).

Plaintiff exhausted proceedings before the Commissioner, and now seeks judicial review

of the final decision denying benefits.  She alleges the Administrative Law Judge (ALJ)

erred in assessing residual functional capacity (RFC) because she failed to properly

evaluate the medical opinions; and "failed to provide a narrative bridge linking the medical evidence with the [RFC] limitations [assessed];" and, because substantial evidence does not support the ALJ's RFC assessment since the evidence suggests greater limitations than those assessed.  (Pl. Br. 10).

The court's review is guided by the Act.  Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009).  Section 405(g) of the Act provides that in judicial review "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  The court must determine whether the ALJ's factual findings are supported by substantial evidence in the record and whether she applied the correct legal standard.  Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); accord, White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001).  Substantial evidence is more than a scintilla, but it is less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971); see also, Wall, 561 F.3d at 1052; Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988).

The court may "neither reweigh the evidence nor substitute [its] judgment for that of the agency."  Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord, Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005).  Nonetheless, the determination whether substantial evidence supports the Commissioner's decision is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by

other evidence or if it constitutes mere conclusion.  Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

The Commissioner uses the familiar five-step sequential process to evaluate a claim for disability.  20 C.F.R. § 416.920; Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset, whether she has a severe impairment(s), and whether the severity of her impairment(s) meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1).  Williams, 844 F.2d at 750-51.  After evaluating step three, the Commissioner assesses claimant's RFC.  20 C.F.R. § 416.920(e).  This assessment is used at both step four and step five of the sequential evaluation process.  Id.

The Commissioner next evaluates steps four and five of the sequential process-- determining at step four whether, in light of the RFC assessed, claimant can perform her past relevant work; and at step five whether, when also considering the vocational factors of age, education, and work experience, claimant is able to perform other work in the economy.  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In steps one through four the burden is on Plaintiff to prove a disability that prevents performance of past relevant work.  Blea v. Barnhart, 466 F.3d 903, 907 (10th Cir. 2006); accord,

3

Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2. At step five, the burden shifts to the Commissioner to show that there are jobs in the economy which are within the RFC assessed.  Id.; Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999).

The court addresses each alleged error in the order presented in Plaintiff's Social Security Brief, but finds no error in the ALJ's decision.

**II.      Evaluation of the Medical Opinions**

Plaintiff claims the ALJ erred in weighing the medical opinions.  Specifically, she argues that the ALJ erroneously accorded "little weight" to the opinion of her primary care physician, Dr. Keller; failed to assign weight to the opinion of her treating mental health provider, Dr. Wahba; failed to discuss or assign weight to the opinion and report of a non-treating physician who examined Plaintiff, Dr. Hughey; accorded excessive weight to the opinions of a non-treating physician, Dr. Andrews, and a non-treating psychologist, Dr. Pulcher; and erred in assessing "some weight" to the opinion of a non-examining psychologist, Dr. Cohen.  (Pl. Br. 10-15).

The Commissioner argues that the ALJ properly considered the medical opinions. She points to evidence discussed and relied upon by the ALJ, which she argues is substantial record evidence supporting the decision.  She explains how, in her view, the record evidence supports the ALJ's evaluation of the medical opinions of Dr. Andrews, Dr. Kaur, Dr. Keller, Dr. Hughey, Dr. Pulcher, Dr. Cohen, and Dr. Wahba.  (Comm'r Br. 12-26).  The court finds no error in the ALJ's evaluation of the medical opinions.

## A.    Standard for Weighing Medical Opinions

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources[1] that reflect judgments about the nature and severity of [a claimant's] impairment(s) including [the claimant's] symptoms, diagnosis and prognosis." 20 C.F.R. § 416.927(a)(2).  Such opinions may not be ignored and, unless a treating source opinion is given controlling weight, all medical opinions will be evaluated by the Commissioner in accordance with factors contained in the regulations.  Id. § 416.927(c) (effective March 26, 2012); Social Security Ruling (SSR) 96-5p, West's Soc. Sec. Reporting Serv., Rulings 123-24 (Supp. 2014).  A physician or psychologist who has treated a patient frequently over an extended period of time (a treating source) is expected to have greater insight into the patient's medical condition, and his opinion is generally entitled to "particular weight."  Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003). But, "the opinion of an examining physician [(a non-treating source)] who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion."  Id. at 763 (citing Reid v. Chater, 71 F.3d 372, 374 (10th Cir.

---

[1]The regulations define three types of "acceptable medical sources:"

"Treating source:"  an "acceptable medical source" who has provided the claimant with medical treatment or evaluation in an ongoing treatment relationship.  20 C.F.R. § 416.902.
"Nontreating source:"  an "acceptable medical source" who has examined the claimant, but never had a treatment relationship.  Id.
"Nonexamining source:"  an "acceptable medical source" who has not examined the claimant, but provides a medical opinion.  Id.

1995)).  However, opinions of non-treating sources are generally given more weight than the opinions of non-examining sources who have merely reviewed the medical record. Robinson v. Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004); Talbot v. Heckler, 814 F.2d 1456, 1463 (10th Cir. 1987) (citing Broadbent v. Harris, 698 F.2d 407, 412 (10th Cir. 1983), Whitney v. Schweiker, 695 F.2d 784, 789 (7th Cir. 1982), and Wier ex rel. Wier v. Heckler, 734 F.2d 955, 963 (3d Cir. 1984)).

"If [the Social Security Administration] find[s] that a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) [(1)] is well-supported by medically acceptable clinical and laboratory diagnostic techniques and [(2)] is not inconsistent with the other substantial evidence in [the claimant's] case record, [the agency] will give it controlling weight." 20 C.F.R. § 416.927(c)(2); see also, SSR 96-2p, West's Soc. Sec. Reporting Serv., Rulings 111-15 (Supp. 2014) ("Giving Controlling Weight to Treating Source Medical Opinions").

If the treating source opinion is not given controlling weight, the inquiry does not end.  Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003).  Such an opinion is "still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." Id.  Those factors are:  (1) length of treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or

6

not the physician is a specialist in the area upon which an opinion is rendered; and
(6) other factors brought to the ALJ's attention which tend to support or contradict the
opinion.  Watkins, 350 F.3d at 1301; 20 C.F.R. § 416.927(c)(2-6); see also Drapeau v.
Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001).  The ALJ's findings must be
"sufficiently specific to make clear to any subsequent reviewers the weight he gave to the
treating source's medical opinion and the reason for that weight."  Krauser v. Astrue, 638
F.3d 1324, 1331 (10th Cir. 2011) (citing Watkins, 350 F.3d at 1300)  (quotation omitted).
A factor-by-factor analysis of a medical opinion is not required. Oldham v. Astrue, 509
F.3d 1254, 1258 (10th Cir. 2007).

### B.    The ALJ's Findings

In the decision here, the ALJ began discussing the medical evidence and the
medical treatment records in her step two analysis.  (R. 12).  At step two, she discussed
medical records[2] from Dr. Keller, Dr. Pulcher, Dr. Hughey,[3] and Dr. Andrews.  (R. 12-13)
(citing Exs. B5F, B6F, B8F, B12F).  In her RFC assessment, she continued her summary
of the medical evidence, and discussed medical records from Dr. Andrews, Dr. Keller, Dr.
Hughey, Dr. Pulcher, Dr. Cohen, and Dr. Kaur.  (R. 15-17) (citing Exs. 5A, B4F, 5F,
B6F, B11F, B12F, B14F, B17F).  The ALJ specifically accorded "significant weight" to
the opinions of Dr. Andrews, and "some weight" to the opinions of Dr. Kaur, Dr. Cohen,

---

[2]The ALJ did not name most of the physicians.  They are identified in the exhibits.

[3]At one point, the ALJ cited to Dr. Hughey's report as "Exhibit B12D," but a
review of the evidence cited reveals that it should be Ex. B12F.  (R. 13).

and Dr. Pulcher, but she accorded "little weight" to Dr. Keller's treating source opinions. (R. 16-17).  The ALJ also mentioned the medical opinion of a psychologist, Dr. Doxsee, who had applied the psychiatric review technique in evaluating Plaintiff's mental impairments, but determined that there was "no opinion by Dr. Doxsee to evaluate," because she had provided no work-related functional limitations.  (R. 17) (citing Ex. 3A).

**C.**    **Analysis**

Plaintiff first argues that the ALJ erred in weighing Dr. Keller's treating source opinion because the reasons given to discount Dr. Keller's opinion are not based on the correct standard, did not consider the treatment relationship, and failed to cite specific inconsistencies or point out improper diagnostic procedures.  (Pl. Br. 12).  She then points to evidence which in her view supports Dr. Keller's opinion.  Id. at 12-14.  The court does not agree with Plaintiff's characterizations.

The ALJ stated that she accorded only "little weight" to Dr. Keller's opinions because there is no record evidence supporting the physician's assertion that his opinions relate back to 2007, because Dr. Keller's limitations are so severe that from such limitations one would expect Plaintiff to be receiving significantly greater support services and the medical records do not support such limitations.  Moreover, she discounted the opinions because Dr. Keller used "checkbox forms and provided no basis for his opinions," and because RFC and the question of disability are issues reserved to the Commissioner and are not entitled to either controlling weight or special significance. Each reason given by the ALJ is supported by the record evidence, and Plaintiff does not

argue that the reasons themselves are erroneous.  Rather, she argues that they "are not the standards to assess weight to the treating provider," and that the ALJ "failed to cite any specific inconsistencies in the record or state that [Dr. Keller's] opinions were not supported by acceptable diagnostic procedures."  (Pl. Br. 12).

Plaintiff's argument misunderstands both the law and the decision at issue.  The ALJ cited to the regulation and rulings containing the correct standard for evaluating opinion evidence (R. 15) (citing 20 C.F.R. § 416.927, SSR 96-2p, 96-5p, 96-6p, and 06-3p), and the decision reveals that she applied that standard.  A factor-by-factor analysis of a medical opinion is not required.  Oldham, 509 F.3d at 1258.  Plaintiff claims Dr. Keller's opinions should have been accorded controlling weight (Pl. Br. 14), and she argues that the ALJ "failed to cite any specific inconsistencies in the record or state that [Dr. Keller's] opinions were not supported by acceptable diagnostic procedures."  (Pl. Br. 12).  Contrary to Plaintiff's argument, the ALJ cited Dr. Andrews's opinion and accorded it "significant weight," and cited Dr. Kaur's opinion and accorded it "some weight."  (R. 16) (citing Exs. B6F, 5A).  These physicians' opinions are such evidence as a reasonable mind might accept to reach a conclusion that is contrary to the opinions of Dr. Keller, and as such are substantial evidence justifying the ALJ's determination not to give controlling weight to Dr. Keller's opinions.  SSR 96-2, West's Soc. Sec. Reporting Serv., Rulings 113 (Supp. 2014) (evidence is "substantial evidence" precluding "controlling weight," if it is "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion that is contrary to the conclusion expressed in the medical opinion.").  The

fact that the ALJ did not state the specific inconsistencies between Dr. Keller's opinions

and the opinions of Dr. Andrews and Dr. Kaur is irrelevant, and Plaintiff points to no

authority suggesting that specific inconsistencies must be stated in the decision in order to

deny controlling weight to a treating physician's opinion.

Further, the ALJ discounted Dr. Keller's opinions because the physician provided

no basis for the opinions.  By necessary implication, this finding suggests that Dr.

Keller's opinions are not well-supported by medically acceptable clinical and laboratory

diagnostic techniques, and provides another basis to support the ALJ's determination not

to accord "controlling weight" to Dr. Keller's opinion.

Moreover, with regard to the regulatory factors for evaluating medical opinions,

the ALJ acknowledged that Dr. Keller was a treating source, but she also noted that his

treatment had been less than regular and continuous.  (R. 12) (Plaintiff "has been

occasionally treated by Travis Keller, M.D.").  Plaintiff argues that Dr. Keller was her

primary care provider from at least February 2010 through February 2013, and that he

"saw her regularly during that time."  (Pl. Br. 14).  Dr. Keller's records do not bear out

Plaintiff's argument.  The records show only that Plaintiff saw Dr. Keller on May 17,

2012, and again on February 4, 2013.  (R. 395-404).  The May 17, 2012 visit was an

"Annual exam" (R. 403), at which the only significant negative findings noted on

physical examination were somewhat high systolic blood pressure and Plaintiff's

complaint of chronic musculoskeletal pain.  (R. 403-04).  The "Review of Systems" notes

that every system is without problem except as documented in the history (R. 400-01),

10

and the history reveals "patient's general health status is described as good," and that she reported:  sleeping on the floor due to neck and back pain, that she was worried about osteoporosis, that she frequently drops things, that she has a hard time walking because of callouses and the resulting altered gait causes increased neck pain, and that she can't afford the copayment for her medications.  (R. 400).  The notes from February 4, 2013 are to a similar effect:  No significant findings were noted on physical exam.  "Review of Systems" was negative except as documented in the history.  History contained only Plaintiff's reports of bilateral hip pain, both feet hurt, some urinary incontinence, and occasionally right "funny bone" is acting up.  (R. 395-99).  In her Brief, Plaintiff makes much of the symptoms she reported to Dr. Keller, but the treatment notes do not reveal such concern on the part of the <u>physician</u>.  The record reveals no other treatment by Dr. Keller.

Plaintiff points to Dr. Eidelman's March, 2011 report to Dr. Keller in which Dr. Eidelman noted that a year earlier in February 2010 he had given Plaintiff trigger point injections in the left trapezius muscle and that he was currently treating her for a suspected left rotator cuff injury.  (Pl. Br. 13) (citing R. 417).  The purpose of Plaintiff's reference is unclear.  The treatment note cited does tend to indicate that Dr. Keller was Plaintiff's primary care physician potentially as early as March, 2011, and it shows complaints of pain in 2010 and 2011, but it does not show that the two incidents are related, does not support the significant limitations opined by Dr. Keller, and does not show that the limitations Dr. Keller opined relate back to 2007, or even to 2010.

11

On July 17, 2012, Dr. Keller completed a "Physician's Residual Functional Capacity" form in which he opined that Plaintiff can lift and carry less than ten pounds, that she can sit, or stand and walk less than one hour at a time each and less than three hours each in a workday, and that she must lie down, recline, or elevate her feet for two hours in a workday.  (R. 358).  He opined that Plaintiff cannot perform jobs requiring bilateral manual dexterity or repeated pushing or pulling of foot controls, and that she cannot repetitively grasp, manipulate, or move either arm or hand.  Id.  He opined that Plaintiff may occasionally bend, but may never perform any other postural movements (squat, stoop, crouch, crawl, kneel climb, reach, or maintain balance).  (R. 539).  He opined that Plaintiff has a "mild" limitation against unprotected heights and a "severe" limitation against driving automotive equipment.  Id.  He opined that Plaintiff's pain and fatigue is debilitating, and that her impairments or their treatment would require her to be absent from work more than three times a month.  (R. 360).  He opined that Plaintiff intermittently requires the use of a walker, and that she has been functioning at the level described since September, 2007.  (R. 361).  On February 7, 2013, Dr. Keller prepared a "Physician's Statement" for the Kansas Department of Children and Families to use in determining whether Plaintiff is able to seek employment to pay child support.  (R. 422, 470).  In that statement, he opined that Plaintiff has an impairment which prevents working, that she has been incapacitated since 2007, and that there is no expectation she can return to work.  Id.

As the ALJ found, the limitations opined by Dr. Keller are so severe that if they are true one would expect the record to reveal much greater services for Plaintiff and would expect to find similar limitations suggested in the other medical records. Such evidence is not in the record. And, there is no record evidence which supports the opinion that such limitations have existed since 2007. Moreover, as the ALJ noted, Dr. Keller's opinions are in checkbox forms and provide no evidentiary bases for the opinions. Dr. Keller's RFC form provided space for the physician to explain the bases for his findings regarding pain, difficulty working, side effects of medications, and clinical and laboratory findings, but the information provided by Dr. Keller is so brief as to be unresponsive, and the response regarding pain is illegible. (R. 359, 361). Finally, as the ALJ noted, Dr. Keller's opinions are specifically cast as a residual functional capacity opinion and an opinion regarding employability or disability, and as such are not entitled to controlling weight or to special significance.

Plaintiff points to other record evidence which she asserts is consistent with Dr. Keller's opinions, but Plaintiff's characterization of the evidence is so slanted, and in some cases just plain wrong, as to leave the court wondering about counsel's candor in presenting it. Plaintiff argues that she "was admitted at Menorah Medical Center on October 12, 2011, for neck pain and right shoulder pain." (Pl. Br. 13) (citing R. 304). What happened on October 12, 2011, was that Plaintiff reported to the emergency room at Menorah complaining of withdrawal from suboxone (R. 312), and although the record is not entirely clear, it appears she was provided suboxone and a prescription. (R. 316)

13

("anxiety resolved after, taking medication"); (R. 317) ("Discharge information provided: Instructions/prescription").  The record to which Plaintiff's Brief cites relates to another emergency room visit to Menorah ten days later on October 22, 2011, at which she reported she had not had suboxone for her chronic neck and shoulder pain for two days. (R. 304).  There is no indication Plaintiff was admitted to Menorah, and there is every indication she departed from the emergency room in the late night of the 22nd or the early morning of the 23d.  (R. 304) ("2055 Departed," "0300 Departed").  Moreover, the record reveals that when Plaintiff was told she would not be getting another prescription for suboxone, she became upset, cursed the staff, and left without instructions.  (R. 310).

Plaintiff next points to a visit to St. Luke's Medical Group Cushing on March 26, 2012, and argues that, "[s]he reported that rain and cold weather increase her pain and that when it gets bad, she has to sit still and try to distract herself so she does not think about it."  (Pl. Br. 13) (citing R. 338).  What the record actually says is, "States w/ the recent weather changes her neck has really been popping and painful and she admits she really wants to take hydrocodone.  She states she tries not to think about it and distracts herself and sits still if the pain gets bad."  (R. 338).  In context, and understanding that Plaintiff has had a substance abuse problem with opiates, it appears that what Plaintiff tries not to think about is that she really wants to take hydrocodone.  Plaintiff next cites to a visit at St. Luke's on June 25, 2012 in which "it was noted she had antalgic gait bilaterally," and another visit on August 24, 2012 where "it was noted her gait was antalgic bilaterally."  (Pl. Br. 13) (citing R. 336, 385).  Plaintiff did not explain the

14

complete report in either case.  Both treatment notes cited state, "Examination of gait and station:  Abnormal, Gait evaluation demonstrated antalgia[4] bilaterally, but no ataxia.[5] Assessment of stability:  Normal."  (R. 336, 385).  Thus, the essence of the treatment notes, not recognized by Plaintiff, is that she has pain on weightbearing, but that she is neither uncoordinated nor unstable.  Moreover, the ALJ cited the June treatment note in her decision.  (R. 12) (citing Ex. B3F/2 (R. 337)[6] ("The claimant had antalgic gait bilaterally, but no ataxia")).  Plaintiff's citations to record evidence allegedly supporting Dr. Keller's opinions do not reveal limitations approaching the severity opined by Dr. Keller, and do not support an inference that the limitations have been present since 2007.

Plaintiff next argues that her treating mental health provider, Dr. Wahba, opined that she had a global assessment of functioning (GAF)[7] score of 40-50, that such a score

---

[4]Antalgic gait is defined as "a characteristic g[ait] resulting from pain on weightbearing in which the stance phase of g[ait] is shortened on the affected side." Stedman's Medical Dictionary, 698 (26th Ed. 1995).

[5]Ataxia is defined as "an inability to coordinate muscle activity during voluntary movement, so that smooth movements occur."  Stedman's Medical Dictionary, 161 (26th Ed. 1995).

[6]Page 337, is a continuation of the treatment note from page 336.  The examination of gait and station, and the assessment of stability actually appear on page 336.

[7]A Global Assessment of Functioning, or GAF, score is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning."  Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 32 (4th ed. text revision 2000).  The GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). Id. at 34.  GAF is a classification system providing objective evidence of a degree of mental impairment.  Birnell v. Apfel, 45 F. Supp. 2d 826, 835-36

represents a severe range of functioning, and that the ALJ erred in failing to give weight to that opinion.  (Pl. Br. 14) (citing R. 329-35).  The court does not agree.  Although the ALJ did not specifically mention Dr. Wahba's treatment notes, she did discuss Plaintiff's mental health treatment.  She stated, "the undersigned finds that the claimant's history of opiate dependence is not a severe impairment.  She is on Suboxone therapy and has not abused opiates for four years."  (R. 13).  Later, she noted that Plaintiff "has had very little mental health treatment for her alleged symptoms of anxiety and depression.  She has only had follow up treatment on her opiate dependence with Suboxone, but takes no other psychotropic medications."  (R. 14).  The ALJ's findings are an accurate description of Plaintiff's mental health treatment, and Dr. Wahba was her only mental health treatment source.  Consistent with the ALJ's findings, Dr. Wahba's treatment notes indicate that he was treating Plaintiff exclusively with Suboxone for opiate dependence.  (R. 329-35).  Plaintiff points to Dr. Wahba's first treatment note dated March 29, 2011, and argues from this note that Dr. Wahba opined that Plaintiff has severe mental impairments as indicated by a GAF score of 40-50.

The court finds no error.  First, the ALJ's findings are supported by Dr. Wahba's treatment notes.  Second, Plaintiff looks to Dr. Wahba's first assessment, and argues that

---

(D. Kan. 1999) (citing Schmidt v. Callahan, 995 F. Supp. 869, 886, n.13 (N.D. Ill. 1998)).

A GAF score in the range from 41 to 50 indicates "**Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)." DSM-IV-TR, at 34 (emphasis in original).

it should be used to determine Dr. Wahba's treating source opinion with regard to Plaintiff's mental limitations.  However, that assessment appears to have been Plaintiff's first visit with Dr. Wahba, and an opinion expressed at a first examination can hardly be considered a treating source opinion.  Finally, and most importantly, Plaintiff does not demonstrate that Dr. Wahba provided an opinion regarding serious or severe mental limitations.  The record to which Plaintiff cites says nothing about global assessment of functioning, or GAF.  To be sure, the record contains an "Axis V" diagnosis, and an "Axis V" diagnosis is normally understood to be a GAF score.  DSM-IV-TR, at 32-35.  But, Plaintiff makes no argument that that fact should be obvious to the ALJ or that the ALJ must discuss a GAF score as a medical opinion.  Moreover, as the Commissioner's argument suggests, the Commissioner has declined to adopt the GAF scale for use in her disability programs; Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50,764-65 (Aug. 21, 2000); and since that time, the American Psychiatric Association has eliminated the GAF scale from DSM-V. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-V) 16 (5th ed.)  Finally, the "Axis V" diagnosis in the treatment note to which Plaintiff cites is illegible and unknowable.  Plaintiff asserts that it is "40-50," but a range of "70-80" could be just as easily understood from the symbols inserted in the "Axis V" space on Dr. Wahba's form.  Moreover, the court notes that the GAF scale, when considered as a range of functioning, is usually understood as a ten point range beginning with one, and ending with the next multiple of ten.  DSM-IV-TR, at 34 (i.e., 1-10, 21-30, 41-50, etc.).  There is

just no way to ascertain the "Axis V" diagnosis assessed by Dr. Wahba. Plaintiff has

shown no error in the ALJ's consideration of Dr. Wahba's treatment notes.

Plaintiff next claims the ALJ erred in failing to discuss or give weight to the

opinion of Dr. Hughey, who prepared a report of a physical examination of Plaintiff on

January 26, 2013. (Pl. Br. 14) (citing R. 424-27). Contrary to Plaintiff's argument, the

ALJ discussed Dr. Hughey's examination and report extensively. (R. 13, 15, 16) (citing

Ex. B12F). The first discussion was a summary of Dr. Hughey's report:

> The claimant was seen by a consultative physician in January 2013 for
> complaints of hypertension, diabetes with neuropathy, back, neck and leg
> pain, edema, obsessive compulsive disorder with anxiety and depression.
> Upon examination, the claimant had some limitation in range of motion of
> the knees and cervical spine, but normal range of motion of the hips.
> Straight leg raise was negative, but she had some giveaway weakness of the
> upper extremities. The claimant had moderate difficulty with heel and toe
> walking and severe difficulties with squatting and hopping, but otherwise,
> his [sic] neurological examination was normal. The claimant was assessed
> with diabetes and hypertension, not on medical management; arthralgias;
> and depression and anxiety with OCD, not on medical management.
> (Exhibit B12D).[8]

(R. 13). Later, she noted Dr. Hughey's finding that Plaintiff "had no clinical neuropathy,

retinopathy or end organ damage and she does not check her blood sugars routinely" (R.

13), that an x-ray of Plaintiff's spine showed no significant abnormalities (R. 15) (citing

Ex. B12F/5 (R. 428)), and that for her mental health treatment Plaintiff was taking no

prescription medication other than suboxone. (R. 15-16) (citing Ex. 12F/1 (R. 424)).

---

[8]It was here that the ALJ referred to Dr. Hughey's report as "Exhibit B12D," but
she identified the "consultative physician in January 2013," and a comparison of her
summary with Dr. Hughey's report confirms that the citation should be to Ex. B12F.

What is clear from the decision is that the ALJ accepted the report and diagnoses of Dr. Hughey at face value.  But it is equally clear that Dr. Hughey did not opine regarding any functional limitations.  Plaintiff points to no error in accepting Dr. Hughey's report, and there is no need for the ALJ to accord relative weight to Dr. Hughey's functional limitations because he provided none.

Plaintiff argues that the ALJ erred in according "some weight" to Dr. Cohen's non-examining source opinion because such "opinions are entitled to the least weight and do not constitute substantial evidence to support the ALJ's decision."  (Pl. Br. 15).  While it is true that courts have found that the opinion of non-examining physicians are worthy of the least weight, that is the <u>general</u> rule, and may be overcome when the ALJ provides "a legally sufficient explanation for doing so."  <u>Robinson</u>, 366 F.3d at 1084.  Here, the ALJ provided specific, legitimate reasons for according "little weight" to Dr. Keller's treating source opinion, accorded greater weight to the non-treating source opinion of Dr. Andrews than to the non-examining source opinion of Dr. Cohen, and stated her reasons for doing so.  In the circumstances, that is a legally sufficient reason to accord greater weight to Dr. Cohen's opinion than to Dr. Keller's.  To the extent Plaintiff may be arguing that a non-examining physician's opinion can <u>never</u> constitute substantial evidence in support of a ALJ's decision, that argument is contrary to the regulations, 20 C.F.R. § 416.927(e), and the rulings, SSR 96-6p, and Plaintiff cites no authority for it.

In her final argument regarding the weight accorded to the medical opinions, Plaintiff argues that the ALJ--in according weight to the opinions of Dr. Andrews and Dr.

19

Pulcher--relied merely upon boilerplate language suggesting that "their opinions are not inconsistent with any substantial evidence in the record," and did not provide reasons for the weight given. (Pl. Br. 15). Plaintiff's argument is not clear in light of the ALJ's actual decision, and the court finds no error. Dr. Pulcher's opinion is contained in his report at exhibit B5F in which he opined that Plaintiff would struggle with social interactions, and her perseverance and adaptability seem to be limited. (R. 364). The ALJ addressed the limited weight she gave Dr. Pulcher's opinion:

> [T]he undersigned gives [only] some weight to the opinions of the consultative psychologist at Exhibit 5F as his opined social limitations are too restrictive, given that the record evidence does not show that [Plaintiff's] social limitations would mitigate against her success to the point of being disabled. For instance, as noted above, the claimant testified that she visits with her friends and neighbors daily, either on the phone or they stop by her place. Also, the claimant attends AA/NA meetings. The social restrictions in the above found residual functional capacity account for the claimant's credible social limits and still permit work.

(R. 17). The court finds no boilerplate in this discussion, and the ALJ provided specific examples of the evidence she relied upon in discounting Dr. Pelcher's opinion.

The ALJ also explained the weight accorded to Dr. Andrews's opinion:

> [T]he undersigned gives significant weight to the opinions of the consultative physician at Exhibit B6F, because they are consistent with the record, including the claimant's activities of daily living, and his[9] [sic] own evaluation, and his [sic] residual functional capacity better accounts for the claimant's subjective complaints.

---

[9]Although the ALJ refers to the "consultative physician at Exhibit B6F" with a masculine pronoun, her name is "Heather Andrews." (R. 373).

(R. 16).  Although the ALJ did accord weight to Dr. Andrews's opinions in part because they are consistent with the record, her doing so was not boilerplate.  She went on to explain the record evidence with which the opinions are consistent:  Plaintiff's activities of daily living, and Dr. Andrews's report of her evaluation.  And, the ALJ explained that Dr. Andrews's assessment better accounts for Plaintiff's subjective complaints.

Plaintiff demonstrates no error in the ALJ's evaluation of the medical opinions.

## III.    "Narrative Bridge"

Plaintiff asserts that it is reversible error if an "ALJ does not link the RFC determination to specific evidence in the record," and argues that the ALJ in this case erred because she failed to link the limitations from each medical opinion to the limitations she assessed in the RFC.  (Pl. Br. 16) (citing SSR 96-8p).  She argues that if "the ALJ fails to provide a narrative discussion citing to specific evidence, the reviewing Court [sic] will conclude the RFC is not supported by substantial evidence."  Id. (citing Southard v. Barnhart, 72 F. App'x 781, 784-85 (10th Cir. 2003)).  She argues that "the ALJ, who is not a medical expert, committed reversible error by improperly interjecting her own opinion concerning the seriousness of [Ms.] Terry's impairments as a basis for concluding she was not disabled."  Id. at 18 (citing (without pinpoint citation) Lund v. Weinberger, 520 F.2d 782 (8th Cir. 1975)).  Plaintiff's arguments misunderstand the law in the Tenth Circuit, and misstate the law in the Eighth Circuit.

First, there is no "narrative bridge" requirement that an ALJ explain from where in the evidence each RFC limitation was assessed.  Rather, SSR 96-8p imposes a narrative

discussion requirement on the ALJ when assessing RFC.  West's Soc. Sec. Reporting

Serv., Rulings 149 (Supp. 2014).  The narrative discussion is to cite specific medical facts

and nonmedical evidence to describe how the evidence supports each conclusion, discuss

how the plaintiff is able to perform sustained work activities, and describe the maximum

amount of each work activity the plaintiff can perform.  Id.  The discussion must include

an explanation how any ambiguities and material inconsistencies in the evidence were

considered and resolved.  Id.  And, the narrative discussion must include consideration of

the credibility of plaintiff's allegations of symptoms, and consideration of medical

opinions regarding plaintiff's capabilities.  Id. at 149-50.

Plaintiff is correct to assert that if "the ALJ fails to provide a narrative discussion

citing to specific evidence, the reviewing Court [sic] will conclude the RFC is not

supported by substantial evidence" (Pl. Br. 16), but that is different than requiring a

"narrative bridge" between specific evidence and the RFC limitations assessed by the

ALJ.  The narrative discussion of the ALJ's RFC assessment in this case occupied

approximately six pages.  (R. 12-17).  There, the ALJ cited specific medical facts and

nonmedical evidence to describe how the evidence supports her conclusions, discussed

how the plaintiff is able to perform sustained work activities, discussed the credibility of

Plaintiff's allegations of symptoms, and described the maximum amount of each work

activity the plaintiff can perform.  As has already been demonstrated in this decision, the

ALJ also discussed and evaluated the medical opinions in her narrative discussion.

Second, "there is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion." Chapo v. Astrue, 682 F.3d 1285, 1288 (10th Cir. 2012) (citing Howard v. Barnhart, 379 F.3d 945, 949 (10th Cir. 2004)); Wall, 561 F.3d at 1068-69. The narrative discussion required by SSR 96-8p does not require citation to a medical opinion, or even to medical evidence in the administrative record for each RFC limitation assessed. Castillo v. Astrue, No. 10-1052, 2011 WL 13627, *11 (D. Kan. Jan. 4, 2011). "What is required is that the discussion describe how the evidence supports the RFC conclusions, and cite specific medical facts and nonmedical evidence supporting the RFC assessment." Id. See also, Thongleuth v. Astrue, No. 10-1101-JWL, 2011 WL 1303374, *13 (D. Kan. Apr. 4, 2011). There is no need in this case, or in any other, for the Commissioner to base the limitations in her RFC assessment upon specific statements in medical evidence, or upon opinions in the record.

Contrary to Plaintiff's argument, the ALJ did not improperly interject her opinions for those of the medical sources. Rather, she evaluated each physician's opinions based upon all of the record evidence and stated her reasons for accepting certain of those opinions and rejecting others. That is her duty. Although an ALJ is not an acceptable medical source qualified to render a medical opinion, "the ALJ, not a physician, is charged with determining a claimant's RFC from the medical record." Howard v. Barnhart, 379 F.3d 945, 949 (10th Cir. 2004). "And the ALJ's RFC assessment is an administrative, rather than a medical determination." McDonald v. Astrue, 492 F. App'x 875, 885 (10th Cir. 2012) (citing SSR 96-05p, 1996 WL 374183, at *5 (July 1996)).

23

Because an RFC assessment is made based on "all of the evidence in the record, not only

the medical evidence, [it is] well within the province of the ALJ."  Dixon v. Apfel, No.

98-5167, 1999 WL 651389, at **2 (10th Cir. Aug. 26, 1999); 20 C.F.R. § 416.945(a).

Moreover, the final responsibility for determining RFC rests with the Commissioner, who

has delegated that responsibility to the ALJ in a case such as this.  20 C.F.R.

§§ 416.927(e)(2), 416.946.

Neither Lund nor the law of the Eighth Circuit requires a different conclusion.

Although the Lund opinion states that, "An administrative law judge may not draw upon

his own inferences from medical reports," that statement is mere dicta.  Riddle v. Colvin,

No. 6: 13-03077-CV-S-DGK, 2014 WL 1716182, *5-6 (W.D. Mo. May 1, 2014).  As the

Riddle court explained:

> In Lund, the claimant filed for disability benefits based upon severe
> headaches resulting from an automobile accident.  520 F.2d at 783.  After
> the district court affirmed the ALJ's denial of benefits, the Eighth Circuit
> reversed, holding that the ALJ erred in discrediting the claimant's
> subjective complaints of debilitating headaches because no record evidence
> contradicted the claimant's allegations.  Lund, 520 F.2d at 785–86.  In fact,
> the only medical reports in the record corroborated the claimant's
> allegations of disabling headaches.  Id. at 785.  In dicta, however, the Court
> remarked that the ALJ also erred in rejecting the opinion of the claimant's
> treating physician and relying upon his own inferences from the medical
> reports.  Id.

2014 WL 1716182 at *6.  Here, unlike Lund, the ALJ did not ignore any medical reports

or solely rely upon her own unsubstantiated inferences from the record in assessing

Plaintiff's RFC.  Rather, she wrote a thorough opinion discussing evidence that supported

and detracted from Plaintiff's allegations of disability.  (R. 12–17).  As was the case in

24

Riddle, "in formulating Plaintiff's RFC, the ALJ did not err in relying upon [other] substantial evidence over the properly discounted opinion" of Dr. Keller.  Riddle, 2014 WL 1716182 at *6 (citing Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011)).  As the Riddle court recognized, the law in the Eighth Circuit is to the same effect as the law of the Tenth Circuit:  "a lack of medical evidence to support a doctor's opinion does not equate to underdevelopment of the record as to a claimant's disability, as 'the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians.'" Martise, 641 F.3d at 927 (quoting Schmidt v. Astrue, 496 F.3d 833, 845 (7th Cir. 2007) (emphasis and brackets in Martise).

## IV.    Support for the RFC Assessed

Plaintiff claims the RFC is not supported by substantial record evidence because "the substantial evidence of record suggests more severe limitations than those adopted by the ALJ."  (Pl. Br. 18).  She argues that she reported that her neck popped and was painful with weather changes but the ALJ failed to include a limitation on the need to avoid jobs with weather changes; that Dr. Keller opined that Plaintiff can never crouch or squat, that Dr. Andrews noted difficulty squatting and arising, and that Dr. Hughey noted severe difficulty squatting and arising, but the ALJ failed to assess a limitation from squatting and crouching; that the ALJ found severe mental impairments including moderate limitations in the ability to maintain social functioning, and limited Plaintiff to occasional interaction with the public and with co-workers, but did not limit her contact with supervisors; that Dr. Keller noted foot problems including paresthesia of foot and

25

reports of Plaintiff's being born with her feet turned backward and being unable to drive, but the ALJ failed to mention anything about driving or foot problems. Id. at 18-20.

The court is unconvinced. This section seems to be counsel's determination to throw everything at the wall, and see if anything sticks. Nothing sticks. As to Plaintiff's reports of symptoms, the ALJ considered the credibility of Plaintiff's allegations of symptoms, found them "not entirely credible," and provided nine reasons in support of her determination. (R. 16). Plaintiff has not challenged the ALJ's credibility determination. The ALJ determined that Dr. Keller's opinions are worthy of "little weight," and explained the reasons for the weight accorded to each medical opinion. The court found no error in the ALJ's evaluation of the medical opinions, and will not visit that issue again. Finally, in most of the instances cited, Plaintiff does not suggest functional limitations which should have been included in the RFC assessment, and does not explain how the symptoms, problems, difficulties, severe mental impairments, or moderate limitations in social functioning presented in her Brief equate to the "more severe" functional limitations Plaintiff suggests should have been included in the RFC assessment. Moreover, and most importantly, she does not point to record evidence requiring that the ALJ should have assessed greater functional limitations.

Finally, Plaintiff notes that at her step two analysis the ALJ found mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Plaintiff asserts that it was error for the ALJ to fail to include these findings in her RFC assessment. (Pl.

Br. 20-21).  The court does not agree.  Plaintiff's argument cites to the ALJ's step three analysis where the ALJ applied the Commissioner's Psychiatric Review Technique and found mild restrictions or moderate limitations as identified by Plaintiff in the first three of the four broad mental functional areas (the "paragraph B" criteria of the Mental Listings) the ALJ considered when applying the psychiatric review technique.  (R. 13-14); see also 20 C.F.R. § 416.920a (explaining the psychiatric review technique); and 20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.00A (explaining the Mental Listings and the "paragraph B" criteria).  But, the ALJ was careful to explain at the end of her step three discussion that the "limitations identified in the 'paragraph B' criteria are not a residual functional capacity assessment," and that she had provided an RFC assessment in which she reflected the degree of limitation she found in assessing the "paragraph B" criteria.  (R. 14).  In her RFC assessment, the ALJ found mental limitations restricting Plaintiff to jobs which require only occasional interaction with the public and with co-workers, and require only simple, routine, and repetitive tasks.  (R. 14).  These are the mental limitations assessed by the ALJ, and she included them--both in the hypothetical scenario presented to the vocational expert and in the RFC assessed in her decision.  That is not error.  Plaintiff does not argue that the mental limitations included in the RFC assessed are not supported by the record evidence, and does not suggest other specific mental restrictions which are required by the record evidence.

The court has considered each allegation of error asserted by Plaintiff and has found no error in the final decision of the Commissioner.

27

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's decision.

Dated this 28th day of January 2015, at Kansas City, Kansas.

s:/ John W. Lungstrum
**John W. Lungstrum**
**United States District Judge**